**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Case No. 05-CV-00081-REB-PAC

PARISH OIL CO, INC., and
RAY MOORE TIRE & PETROLEUM SERVICE, INC.,

   Plaintiffs,

v.

DILLON COMPANIES, INC. d/b/a City Market,

   Defendant.

---

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

**Blackburn, J.**

The matter before me is Plaintiffs' Motion for Preliminary Injunction [#15], filed February 4, 2005. I have jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) (diversity of citizenship). By this motion, plaintiffs seek to enjoin defendant from continuing to engage in an alleged pattern of below cost sales of gasoline. I deny the motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This motion implicates the market for retail motor fuel sales in Montrose, Colorado, a town of approximately 15,000 people located on Colorado's Western Slope. Despite its comparatively small size, Montrose boasts no less than 15 retail gasoline outlets,[1] all located within a 1¾-mile radius of the intersection of the town's

---

[1] Testimony at the hearing suggested that there were actually 19 retail gasoline outlets in Montrose. (*See* Tr. at 36; *see also* Exh. 2.) However, the parties previously stipulated that the

two main streets, Main and Townsend. Plaintiff Parish Oil Company owns two of these outlets, one at 1301 East Main, which sells Phillips brand gasoline under the name "66 Food Plaza," the other at 2020 North Townsend, which sells Conoco brand gasoline under the name "Humdinger's Travel Shoppe." Plaintiff Ray Moore Tire & Petroleum Service, Inc., owns a single gas station at 216 North Townsend. Defendant Dillon Companies, Inc., a wholly owned subsidiary of The Kroger Company, operates retail gasoline outlets at its two stores in Montrose. The "South Store," located at 16400 Townsend, has been selling gasoline since 1998. The "Downtown Store," located at 128 South Townsend, began selling gasoline on July 21, 2004.

Defendant and Bradley Petroleum ("Bradley"), another gasoline retailer in Montrose, have traditionally been the low price leaders in town. Although plaintiffs had complained periodically to the Colorado Attorney General about the impact of defendant's and other competitors' gasoline prices on their businesses, they had been able to keep within three or four cents of defendant's posted prices and remain relatively competitive in the Montrose market. However, in December, 2003, the local Safeway opened a fuel center at its grocery store on South Townsend. The entry of this new competitor into the gasoline market triggered a heated price war in Montrose.

---

actual number was 15 (*see* Exh. 1 at 2, ¶ 5), and the court will use this more conservative estimate for purposes of this motion.

Beginning on December 3, 2003, defendant began offering discounts on its posted price for gasoline to customers who purchased more than a certain qualifying dollar amount of groceries. From December 3, 2003, through March 2, 2004, customers who purchased $25 worth of groceries in a single transaction received a discount of 4¢ per gallon off the posted price for gasoline. Customers who purchased $50 worth of groceries received an 8¢ per gallon discount. From March 3, 2004, through November 9, 2004, customers who purchased at least $35 worth of groceries over a seven-day period were offered a 15¢ per gallon discount. From November 10, 2004, through February 28, 2005, a one-time purchase of $50 or more in groceries entitled a customer to a 20¢ per gallon discount. From March 1, 2005, until the time of the hearing, defendant implemented a two-tiered discount whereby all customers with a store loyalty card receive a 3¢ per gallon discount on any purchase of gasoline regardless of whether they also purchased groceries. An additional 7¢ per gallon discount is available to customers who accumulate grocery purchases in excess of $100 over the course of a calendar month. Under all derivations of the program, the fuel discount could be used at any time within two weeks of a qualifying purchase, after which it expired.

Plaintiffs commenced this lawsuit claiming that defendant's grocery discount program violated the Colorado Unfair Practices Act ("UPA"), §§6-2-101 – 6-2-117, C.R.S., which prohibits, *inter alia*, below cost sales of motor fuel, §6-2-105(1)(b).[2]

---

[2] In their amended complaint, plaintiffs' allegations of below cost pricing focused principally on defendant's posted prices for gasoline. However, at the hearing on the motion for preliminary injunction, plaintiffs confined their arguments to the effect of the grocery discount

3

Based on the parties' stipulated evidence, in the period from December 7, 2003, through April 30, 2005, defendant's posted price for gasoline at the South Store was below its lowest "laid-in" cost[3] on 130 of 511 days, and below its actual cost, as defined by the UPA, §6-2-105(2), on 290 of those days.  The Downtown Store's posted price was below the lowest laid-in cost for 44 of the 284 days from its opening on July 21, 2004, through April 30, 2005, and below its actual cost on 140 of those days.  When the customer discount is factored into the equation, the South Store's price was below the lowest laid-in cost for 435 of the 511-day period, and below the lowest actual cost on 505 days, and the Downtown Store's discounted price was below the lowest laid-in cost on 235 of the 284 days, and below the lowest actual cost on 279 of those days.  (*See* Exhs. 3, 4, & 5.)  Plaintiffs seek an injunction to prevent defendant from violating the statute.  An evidentiary hearing was held on June 6, 2005.

## II.  LEGAL PRINCIPLES

The Colorado Unfair Practices Act ("UPA") was enacted in 1937 "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented." §6-2-102, C.R.S.  *See also* ***Dunlap v. Colorado Springs Cablevision, Inc.***, 829 P.2d 1286, 1292 (Colo. 1992) ("The Unfair Practices Act was thus enacted primarily to protect the public and

---

program.

[3] "Laid-in" cost is the cost of gasoline sold at the refiner terminal rack ("rack price") plus common carrier freight charges, state fuel taxes, and a state environmental fee.

encourage competition."). In its original form, the UPA simply prohibited all sales below cost, and the original language of the pertinent section continues to apply to sales of products other than gasoline. *See* § 6-2-105(1)(a), C.R.S. However, beginning in the early 1990s, independent petroleum marketers pushed for amendments to the UPA that would specifically address the perceived problem of vertically integrated refiner-marketers selling gasoline at their self-operated retail outlets at prices equal to or less than the lowest wholesale price available to independent operators. However, the independents' initial solution, Senate Bill 92-203, failed to go anywhere. Thereafter, then state Attorney General Gale Norton appointed a task force to examine the marketing of gasoline products in Colorado. The task force, consisting of representatives of both the refiner-operators and independent operators, as well as antitrust lawyers, economists, members of the Attorney General's Office, and representative of the Colorado Petroleum Marketers Association, met no less than ten times over a six-month period beginning in June, 1992. On December 22, 1992, the task force issued its 42-page report. (*See* Report of The Colorado Attorney General's Petroleum Marketing Practices Task Force [hereinafter "Task Force Report"] at 3-5 (Dec. 22, 1992).)

The task force indeed found that on a few occasions in the time period from March through May, 1991, major integrated oil companies had set retail prices below rack prices. Such "price inversions," however, were less prevalent than the practice of setting retail prices at margins insufficient to account for a normal cost of doing business. (*See id.* at 10-20.) Nevertheless, while some individual competitors had

5

lost money over the previous years, there was no clear evidence of competitive injury to independent marketers as a group, and the allegedly predatory pricing practices had not resulted in greater market share for the major refiners. In fact, the task force found that in 1992, branded refiners accounted for 55.96% of the gasoline gallons sold in Colorado, compared to the 91.17% market share they held in 1980. By contrast, independent marketers held a 44.04 to 48.3% share of the Colorado market, slightly above the national average of 43%. Nor was there any evidence that consumers had been harmed, although the task force did not discount the possibility that such practices could drive independent marketers out of business and ultimately result in higher gasoline prices for consumers  (*Id.* at 22-27.)

After examining several possible alternatives, (*see id.* at 35-39), the task force recommended amending the UPA to prohibit retailers from engaging in a pattern of below cost sales which had the effect of injuring competitors or destroying competition (*id.* at 39-40).[4] The task force recommended this change because the requirement of proof of "intent" presented an almost insurmountable hurdle to proving a violation of the UPA and made litigation thereunder extremely complex and costly. (*Id.* at 29.) In addition, the task force believed that requiring proof of actual harm, rather than mere intent to harm, created a more objective standard by which to establish violations of the UPA. (*Id.* at 40.)

That proposal, initially incorporated into Senate Bill 93-224, would have applied

---

[4] A second proposal recommended giving the Attorney General the power to issue compulsory process in aid of investigating alleged violations of the UPA. (Task Force Report at 40.) That proposal is now codified at §6-2-111.5, C.R.S.

6

to below cost sales of all products in the state of Colorado, not just gasoline.  (*See* S.B. 93-224, 59th Gen. Assm., 1st Sess. (introduced March 11, 1993).)  Subsequent revisions of the bill refined its language such that the amendment applied only to sales of motor fuels.  (*See* S.B. 93-224, 59th Gen. Assm., 1st Sess. (engrossed April 19, 1993).)  As ultimately enacted on July 1, 1993, the amendment provides, in relevant part,

> It is unlawful for any person, partnership, firm, corporation, joint stock company, or other association engaged in business within this state to engage in a pattern of selling, offering for sale, or advertising for sale motor fuel for less than the cost thereof to such vendor, when such pattern has the effect of injuring one or more competitors or destroying competition.

§6-2-105(1)(b), C.R.S.

### III.  STANDARD OF REVIEW

Plaintiffs are entitled to a preliminary injunction only if they prove that (1) there is a substantial likelihood that they will prevail on the merits; (2) they will suffer irreparable harm unless the preliminary injunction is issued; (3) the threatened injury outweighs the harm the preliminary injunction might cause defendant; and (4) the preliminary injunction if issued will not adversely affect the public interest.  **Prairie Band of Potawatomi Indians v. Pierce**, 253 F.3d 1234, 1246 (10th Cir. 2001).  Because a preliminary injunction is an extraordinary remedy, plaintiffs' right to relief must be clear and unequivocal.  *See* **Federal Lands Legal Consortium ex rel. Robart Estate v. United States**, 195 F.3d 1190, 1194 (10th Cir. 1999).  Moreover, injunctions that disturb the *status quo ante*, are mandatory rather than prohibitory, or award the

movant substantially all the relief it would receive following a verdict on the merits, are particularly disfavored. *See* **SCFC ILC, Inc. v. Visa USA, Inc.**, 936 F.2d 1096, 1098-99 (10th Cir. 1991). The injunction sought here arguably falls within at least two of these categories, and thus plaintiffs "must show that on balance, the four factors weight heavily and compellingly in [their] favor." *Id.* at 1099; *see also* **Salt Lake Tribune Publishing Co. v. AT&T Corp.**, 320 F.3d 1081, 1099 (10th Cir. 2003).

## IV. ANALYSIS

The UPA prevents a retailer from engaging in a pattern of below cost sales of motor fuel which has the effect of injuring competitors or destroying competition. It appears that no court in Colorado, either state or federal, has yet interpreted this particular provision of the UPA. Nevertheless, the plain language of the statute clearly admits of two key elements: (1) a pattern of below cost sales; and (2) causation.[5] Although plaintiffs have clearly established the first element (*see* Exhs. 3, 4 & 5), their evidence falls short of proving the second.

Plaintiffs' proof of causation hinges on the testimony of their expert witness, Dr.

---

[5] Defendant posits a third element: intent. I cannot agree that the UPA requires implication of such an element. As clearly demonstrated by the Task Force Report, the major impetus behind the task force's recommendation of an effect-based standard was to lessen the burden of proving a violation of the UPA. (*See* Task Force Report at 29. 39-40.) Nor does the failure to include an intent element render section 6-2-105(1)(b) unconstitutional. Where legislation relates to the regulation of economic affairs within the police power of the state, it need bear only a rational relationship to a legitimate government objective. *See, e.g.*, **Glenn Smith Oil Co. v. Sheets**, 704 P.2d 474, 478 & n.4 (Okla. 1985) (citing, *inter alia*, **Nebbia v. People of New York**, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934)). Under this standard, section 6-2-105(1)(b) passes muster. *See, e.g.*, **R.L. Jordan Oil Co. of North Carolina, Inc. v. Boardman Petroleum, Inc.**, 353 F.3d 334, 336-38 (4th Cir. 2003); **Gross v. Woodman's Food Market, Inc.**, 655 N.W.2d 718, 742 (Wis. App. 2002), *review denied*, 661 N.W.2d 100 (Wis. 2003); **State, Division of Consumer Protection v. Rio Vista Oil, Ltd.**, 786 P.2d 1343, 1349-50 (Utah 1990). The case defendant cites is inapposite. *See* **Perkins v. King Soopers, Inc.**, 221 P.2d 343, 345 (Colo. 1950).

Jeffrey Bernard. Dr. Bernard noted that the South Store's volume increased 46% in 2004 versus 2003, whereas volume statewide increased only 2.1%. Similarly, the population of Montrose County grew at a rate of 3.5%, which translates into a growth in gasoline demand of 2 to 3%. Therefore, the South Store's volume increases outpaced demand growth by a factor of 20. By contrast, plaintiffs' volumes decreased 19% during this same period. (*See* Exh. 40 at 8-9.) Plaintiffs and Bradley also lost significant margin and gross profits in 2004 as compared to 2003. (*Id.* at 12; *see also* Tr. at 125-127.) In Dr. Bernard's opinion, defendant took volume from all its competitors in proportion to their abilities to compete by cutting prices. At the very least, Dr. Bernard believed that defendant created the conditions that caused plaintiffs' losses. (Exh. 40 at 9-10; Tr. at 127-129.)

However, as pointed out by defendant's expert, Dr. Michelle Burtis, this analysis and its attendant conclusions are too simplistic. Unlike Dr. Bernard, Dr. Burtis analyzed plaintiffs' volume figures for both 2004, as compared to 2003, *and* for 2003, as compared to 2002. These calculations show that in many months in 2003, Ray Moore lost more volume over the same time period in the preceding year than he did in 2004, while defendant's grocery discount program was in place. Indeed, whereas Moore had four months of positive volume gains in 2004, as versus 2003 (February, April, July, and August),[6] he experienced only two months of gains in 2003, as versus 2002 (June and November). (Exhs. 66 at 21, ¶ 42 & Exh. 60.) In fact, in June and July,

---

[6] Indeed, Moore gained 29% in volume in April, soon after defendant had significantly increased its grocery discount from 4 to 15 cents per gallon.

2004, when there is no evidence of below cost pricing by defendant, Moore's volumes went up in one month and down in another. (Exh. 60; Tr. at 212.) In addition, although Moore's profit margins were rather low, he actually made slightly more profit in fiscal year 2004 than he had in fiscal year 2003. (Exhs. 54 & 55.) As for Parish Oil's outlets, from January through November, 2004, the Humdingers station sold more volume in every month as versus 2003 excect September and October. (Exh. 62.) By contrast, the 66 Food Plaza experienced negative volume changes in this same time period even though both Parish outlets offered the same retail price for gasoline. (*See* Tr. at 214.)[7]

As Dr. Burtis concluded, given these figures, it is difficult to discern a cause and effect relationship between defendant's grocery discount program and plaintiffs' injuries. I find this testimony credible and compelling. The fluctuations in plaintiffs' volumes do not correlate closely to the implementation of or changes in defendant's grocery discount program, and plaintiffs have not adequately accounted for other factors that may have influenced their market share during the relevant time period.[8] They therefore have failed to establish a likelihood of success on the merits of their claim that defendant's below cost pricing had the effect of causing their injury.[9]

---

[7] Nor was there any particular correlation between Bradley's volume changes and changes in the grocery discount program. Instead, Bradley only started losing volume after the Downtown Store opened its fuel center in July, 2004. (*See* Exh. 65 at 27; Tr. at 217.)

[8] Indeed, plaintiffs' own witnesses acknowledged that many factors affect gasoline volume. (*See* Tr. at 84 (testimony of Bradley Calkins), & at 149 (testimony of Dr. Bernard).)

[9] Defendant maintains that its conduct does not violate the statute in any event because it is permitted by section 6-2-113, C.R.S., which provides,

As for the second factor, irreparable harm, Parish contends that it has lost customer goodwill and reputation as a result of being unable to compete with defendant's retail gasoline prices. (*See* Exh. 39 at 7-8, ¶¶ 21-23.) Ray Moore was actually forced to shut down operations in November, 2004. (Tr. at 99-100.) Although generally a loss of profits can be compensated by monetary damages, where the viability of a party's livelihood is threatened, injury may be irreparable. *See* ***S.W. Shattuck Chemical Co. v. City and County of Denver, Colorado***, 1 F.Supp.2d 1235, 1239 (D. Colo. 1998) (citing ***Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.***, 805 F.2d 351, 356 (10th Cir. 1986)); ***Studio 1712, Inc. v. Etna Products Co.***, 777 F.Supp. 844, 854 (D. Colo. 1991).

---

> For the purpose of preventing evasion of the provisions of this article in all sales involving more than one item or commodity and all sales involving the giving of any concession of any kind, whether it be coupons or otherwise, the vendors' or distributors' selling price shall not be below the cost of all articles, products, commodities, and concessions included in such transactions.

Defendant argues that pursuant to this section, no violation occurred because the cost of the gasoline discount was fully covered by the profit it realized on associated grocery sales. (*See* Exh. 47; Tr. at 169-70.) Plaintiffs counter that to interpret the UPA in this manner effectively renders it toothless as a tool against loss leader sales. Although plaintiffs' argument has intuitive appeal, it runs counter to the only decision to interpret this section of the UPA. *See* ***Mastercar, Inc. v. AMOCO Oil Co.***, 835 P.2d 534, 536-37 (Colo. App. 1992). Nor can I agree with plaintiffs that defendant cannot rely on this section simply because it cannot prove that the profits realized in any one transaction covered the cost of the discount for that particular transaction. I see nothing in the plain language of this section that requires defendant to proffer such transaction-by-transaction proof. Nevertheless, given the deficiency in plaintiffs' proof of causation, I find it unnecessary to rely on section 6-2-113 in denying plaintiffs' motion for preliminary injunction.

Defendant also argues that no violation has been shown because it acted in good faith, setting its prices only to meet competition. However, the limits of any such defense are circumscribed by the UPA itself, and defendant has failed to show that it "made a bona fide effort to determine the legality" of its competitors' prices. § 6-2-115(2)(d), C.R.S.

11

Nevertheless, I find that plaintiffs' claims of irreparable injury are belied by the fact of their delay in waiting to file the present lawsuit. "'Delay of this nature undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'" ***GTE Corp. v. Williams***, 731 F.2d 676, 678 (10th Cir. 1984) (quoting ***Le Sportsac, Inc. v. Dockside Research, Inc.***, 478 F.Supp. 602, 609 (S.D.N.Y. 1979) (footnote omitted)). Granted, plaintiffs were required to prove a pattern of below cost pricing, and thus could not have filed suit when the grocery discount program was first implemented in December, 2003. Nevertheless, I find it unreasonable in the particular circumstances of this case for plaintiffs to have waited more than a year – indeed, to have waited until one of them was forced out of business – to seek to enjoin these ongoing practices.[10]

The third consideration is the balance of harms between the parties. Defendant has presented evidence that in the time since this lawsuit was filed, it has lost 18% to 20% in volume at its South Store by attempting to comply with plaintiffs' perceived demands. (Tr. at 190.)[11] In other circumstances, this dramatic decrease still would not tip the balance in defendant's favor when weighed against plaintiffs' potential loss of livelihood and customer goodwill. However, because plaintiffs have failed to establish that defendant's pricing practices caused their losses, I cannot find

---

[10] When Ray Moore had complained of similar instances of below cost sales in June, 1999, the state Attorney General's office suggested that it would require "several months" worth of data in order to proceed. (*See* Exhs. 41 & 42.)

[11] Since February, 2005, defendant has maintained a retail price at least five cents above cost. (Tr. at 190.)

that the balance of harms weighs in favor of plaintiffs. At best, it is a wash.

The final factor I must consider is the public interest. In general, it would not be adverse to the public interest to enforce an injunction requiring compliance with the UPA. ***See Starr Fuel Marts, LLC v. Sam's East, Inc***., 362 F.3d 639, 652 (10th Cir. 2004). Here again, however, it would be adverse to the public interest to enjoin behavior which plaintiffs have failed to prove violated the statute.

**THEREFORE, IT IS ORDERED** that Plaintiffs' Motion for Preliminary Injunction [#15], filed February 4, 2005, is **DENIED**.

Dated July 25, 2005, at Denver, Colorado.

BY THE COURT:

s/Robert E. Blackburn
Robert E. Blackburn
United States District Judge