**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Case No.  05-cv-00081-REB-PAC

PARISH OIL CO, INC., and
RAY MOORE TIRE & PETROLEUM SERVICE, INC.,

     Plaintiffs,

v.

DILLON COMPANIES, INC. d/b/a City Market,

     Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND MOTION TO PRECLUDE
JEFFREY BERNARD'S EXPERT REPORTS AND TESTIMONY**

Blackburn, J.

The matters before me are (1) **Defendant's Motion for Summary Judgment**
[#100], filed December 22, 2005; and (2) **Defendant's Motion to Preclude Jeffrey
Bernard's Expert Reports and Testimony** [#102], filed December 22, 2005.  I deny
both motions.

## I.  JURISDICTION

I have jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) (diversity of
citizenship).

## II.  STANDARD OF REVIEW

Summary judgment is proper when there is no genuine issue as to any material
fact and the movant is entitled to judgment as a matter of law.  FED.R.CIV.P. 56(c);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265

(1986).  A dispute is "genuine" if the issue could be resolved in favor of either party.

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586,

106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Farthing v. City of Shawnee*, 39 F.3d

1131, 1135 (10th Cir. 1994).  A fact is "material" if it might reasonably affect the outcome

of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505,

2510, 91 L.Ed.2d 202 (1986); *Farthing*, 39 F.3d at 1134.

A party who does not have the burden of proof at trial must show the absence of

a genuine fact issue.  *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d

1513, 1517 (10th Cir. 1994), *cert. denied*, 115 S.Ct. 1315 (1995).  Once the motion has

been properly supported, the burden shifts to the nonmovant to show, by tendering

depositions, affidavits, and other competent evidence, that summary judgment is not

proper.  *Id.* at 1518.  All the evidence must be viewed in the light most favorable to the

party opposing the motion.  *Simms v. Oklahoma ex rel Department of Mental Health*

*and Substance Abuse Services*, 165 F.3d 1321, 1326 (10th Cir.), *cert. denied*, 120

S.Ct. 53 (1999).  However, conclusory statements and testimony based merely on

conjecture or subjective belief are not competent summary judgment evidence.  *Rice v.*

*United States*, 166 F.3d 1088, 1092 (10th Cir.), *cert. denied*, 120 S.Ct. 334 (1999);

*Nutting v. RAM Southwest, Inc.*, 106 F.Supp.2d 1121, 1123 (D. Colo. 2000).

### III.  ANALYSIS

The facts and procedural background of this lawsuit are set forth in detail in my

**Order Denying Motion for Preliminary Injunction** [#86], filed July 25, 2005, and need

2

not be repeated here at length.  Plaintiffs own and operate retail gasoline stations in Montrose, Colorado.  Defendant also operates retail gasoline outlets in Montrose at its two City Market grocery stores.  This lawsuit challenges defendant's grocery discount program by which defendant's customers are eligible to receive discounts on the posted per-gallon price of gasoline if they purchase a minimum dollar amount of groceries within a specified time period.  Plaintiffs claim that this program violates the Colorado Unfair Practices Act (the "UPA"),  §§ 6-2-101 - 6-2-117, C.R.S., because it permits below cost sales of gasoline.  Under the UPA,

> [i]t is unlawful for any person, partnership, firm, corporation, joint stock company, or other association engaged in business within this state to engage in a pattern of selling, offering for sale, or advertising for sale motor fuel for less than the cost thereof to such vendor, when such pattern has the effect of injuring one or more competitors or destroying competition.

§ 6-2-105(1)(b), C.R.S.  Plaintiffs allege that they have been damaged as a result of defendant's grocery discount program.

Defendant moves for summary judgment on two grounds.  First, it maintains that § 6-2-113 of the UPA affirmatively authorizes its grocery discount program by permitting combined or bundled sales of more than one item so long as the price charged is not below the aggregate cost of all items included in the sale.  Alternatively, defendant argues that plaintiffs cannot present a triable issue of fact regarding causation without the expert testimony of Jeffrey Bernard, whose opinions defendant seeks to exclude by way of its separate Rule 702 motion.

**A. § 6-2-113**

As noted above, § 6-2-105(1)(b) of the UPA specifically prohibits below cost

sales of gasoline.  Defendant maintains, however, that § 6-2-113 essentially creates a

savings clause for combined or bundled sales:

> For the purpose of preventing evasion of the provisions of
> this article in all sales involving more than one item or
> commodity and in all sales involving the giving of any
> concession of any kind, whether it be coupons or otherwise,
> the vendors' or distributors' selling price shall not be below
> the cost of all articles, products, commodities, and
> concessions included in such transactions.

§ 6-2-113, C.R.S.

As is true in interpreting any statutory provision, the court begins with the plain

language of the statute.  *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124

S.Ct. 1023, 1030, 157 L.Ed.2d 1024 (2004); *United States v. Welch*, 327 F.3d 1081,

1094-95 (10th Cir. 2003); *Scott v. Matlack, Inc.*, 39 P.3d 1160, 1169 (Colo. 2002).  A

statute that is clear and unambiguous requires no construction and must be applied as

written.  *Holliday v. Bestop, Inc.*, 23 P.3d 700, 705 (Colo. 2001); *Sulca v. Allstate*

*Insurance Co.*, 77 P.3d 897, 899 (Colo. App. 2003).  Defendant interprets § 6-2-113 as

contemplating that the grocery discount program is lawful so long as the price charged

for all articles sold is not less than the aggregate cost of all goods and concessions

included in the transaction.  Because the parties have stipulated that the cost of all

groceries purchased by eligible customers during the relevant time period more than

offset the cost of the gasoline discount in the aggregate, defendant concludes that it is

entitled to summary judgment.

4

Appearing to add ballast to this argument is the fact that it seems to coincide with the holding in the only reported case to even discuss this section.  In *Mastercar, Inc. v. AMOCO Oil Co.*, 835 P.2d 534 (Colo. App. 1992), the Colorado Court of Appeals determined that the offer of a free car wash with a minimum purchase of gasoline was not a gift but rather a combined sale and therefore did not violate § 6-2-105(1) of the UPA .  In deciding that question, the court noted that  § 6-2-113 supported its conclusion:

> Our conclusion is supported by the fact that the General Assembly has guarded against the possibility that a combined sale transaction may be made "for the purpose of injuring competitors and destroying competition." Under both § 6-2-105(1) and § 6-2-113, C.R.S., the General Assembly declared it unlawful to sell products below cost. Besides the language quoted above from § 6-2-105(1), § 6-2-113 also provides as follows:
>
>> [I]n all sales involving more than one item or commodity and in all sales involving the giving of any concession of any kind, whether it be coupons or otherwise, the vendors' or distributors' selling price shall not be below the cost of all articles, products, commodities, and concessions included in such transactions.
>
> The effect of these provisions is that, in any transaction in which a product or article is offered in conjunction with the purchase of another product at no "cost," or at less than "cost," the consideration paid by the purchaser must be sufficient to cover the "costs," as defined under § 6-2-105(2), of both products or articles. By mandating that a combined sale transaction may only be offered at a price above cost, under § 6-2-105(1), the General Assembly prevents the evil it sought to avoid under that portion of § 6-2-105(1) that declares it unlawful to "give" a product to a consumer "for the purpose of injuring competitors and destroying competition." If a product must be sold at or above cost, injury to

5

competitors is averted and the purposes of § 6-2-105(1) are satisfied.

*Mastercar*, 835 P.2d at 536.

Defendant urges me to follow *Mastercar*. *See Webco Industries, Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1132 (10th Cir. 2002) ("[W]here jurisdiction rests solely on diversity of citizenship and there is no controlling decision by the highest court of a state, a decision by an intermediate court should be followed by the Federal court, absent . . . convincing evidence that the highest court of the state would decide otherwise.") (citation and internal quotation marks omitted).  I conclude that I cannot do so for several reasons.  First, because the *Mastercar* court was not actually called on to construe § 6-2-113, its discussion of that section is dicta at best.  Second, the court acknowledged that it was considering only the question of whether the offer of the car wash in connection with another sale was a gift.  It stated expressly that the outcome might have been different if the evidence had indicated that the defendant intended to sell the products below cost.  *Mastercar*, 835 P.2d at 537.[1]  However, § 6-2-105(1)(b) does not require proof of an intent to injure competitors or competition.  (*See* **Order Denying Motion for Preliminary Injunction** at 8 n.3 [#86], filed July 25, 2005.) Therefore, it is at least arguable that the court might have reached a different result had § 6-2-105(1)(b) been in effect at the time.  Third, through the strategic use of brackets, the *Mastercar* opinion ignores completely the introductory clause of the statute.  *See*

---

[1]  At the time of the *Mastercar* decision, § 6-2-105(1) generally prohibited all below cost sales made with the *intent* to injure competitors or destroy competition.  The following year the section was amended by the addition of § 6-2-105(1)(b), which applies specifically to below cost sales of gasoline and requires proof only that such sales have the *effect* of injuring competition or competitors.

*Mastercar*, 835 P.2d at 536.  As a matter of statutory interpretation, such an insular

approach is inappropriate.  *See People v. Luther*, 58 P.3d 1013, 1015 (Colo. 2002)

(court assumes that General Assembly intended entire statute be effective); *Sulca*, 77

P.3d at 899 ("Any [statutory] construction that would render any clause or provision

unnecessary, contradictory, or insignificant should be avoided.").

Finally, the facts of *Mastercar* do not correspond as closely to the grocery

discount program as defendant would have me believe.  In fact, unlike the combined

sale in *Mastercar*, the grocery discount program more closely approximates a

concession or coupon.[2]  A customer need not purchase the requisite dollar amount of

groceries in a single transaction to be entitled to the discount, but instead, may

accumulate the minimum purchase amount over a period of time.  Concomitantly, the

discount thus earned can be redeemed at any time within a specified period.  Given

those circumstances, § 6-2-113 requires that the cost of the concession be added to

the cost of all other "articles, products, [and] commodities . . . included in the

transactions."  Defendant's reliance on the parties' stipulation, however, proves only

that the cost of the products contained in the transactions in question – the groceries

and the gasoline purchased in the aggregate using the discount program during the

relevant time period – exceeded the actual costs of both items in the aggregate.

Because this evidence fails to account for the cost of the concession, defendant is not

entitled to summary judgment.

---

[2]  Although I continue to adhere to my conclusion that  § 6-2-113 does not require proof at the level of each separate transaction, as plaintiffs advocate, as explained more fully herein, I agree with them that the grocery discount program is a concession and not a combined sale.

Nevertheless, and even if such evidence could be developed,[3] I conclude that § 6-2-113 does not permit the end-run around the underlying purposes of the UPA that defendant's interpretation would facilitate.  The introductory phrase of § 6-2-113 mandates expressly that the section must be interpreted "[f]or the purpose of preventing evasion of the provisions of" the UPA.  The UPA was enacted in 1937 "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented." § 6-2-102, C.R.S.  ***See also Dunlap v. Colorado Springs Cablevision, Inc.***, 829 P.2d 1286, 1292 (Colo. 1992) ("The Unfair Practices Act was thus enacted primarily to protect the public and encourage competition.").  In particular, a primary purpose of the UPA was to prevent the practice of "loss leader" selling:

> One of the chief aims of state laws prohibiting sales below cost was to put an end to "loss-leader" selling. The selling of selected goods at a loss in order to lure customers into the store is deemed not only a destructive means of competition; it also plays on the gullibility of customers by leading them to expect what generally is not true, namely, that a store which offers such an amazing bargain is full of other such bargains.

***Star Fuel Marts, LLC v. Sam's East, Inc.***, 362 F.3d 639, 646 (10th Cir. 2004) (quoting ***Safeway Stores, Inc. v. Oklahoma Retail Grocers Association, Inc.***, 360 U.S. 334, 340, 79 S.Ct. 1196, 1201, 3 L.Ed.2d 1280 (1959) (emphasis added).  ***See also Dikeou v. Food Distributors Association***, 108 P.2d 529, 534 (Colo. 1940) ("The destruction

---

[3] I must admit, however, to being nonplused as to how adding the cost of the concession into the equation might save a sale below cost of any one or more items included in the transaction.

of competition by selling 'loss leaders' is generally recognized.").  The UPA

accomplishes this goal by prohibiting below cost sales, which theoretically at least,

allow larger competitors to absorb temporary losses, drive smaller competitors out of

business, and thus obtain a monopoly, with a concomitant negative effect on consumer

prices.  *See* REPORT OF THE COLORADO ATTORNEY GENERAL'S PETROLEUM MARKETING

PRACTICES TASK FORCE at 22, 26-27 (Dec. 22, 1992).

In contrast to these purposes, which § 6-2-113 expressly directs me to consider,

the latter clauses of  § 6-2-113 seem to give back what the introductory clause purports

to take away.  If read literally, these latter clauses suggest the very interpretation

defendant urges here: that a transaction will be considered legal so long as the price

charged accounts for or exceeds the cost of all items included in the transaction.  The

fact that the language of these clauses does not refer to the price of each item

separately makes this interpretation seem perfectly reasonable, at least as considered

in isolation from the rest of the statute.

However, in construing a statute, the goal is to harmonize, insofar as is possible,

all parts of the statute, giving meaning and effect to each.  Having read and re-read this

section numerous times, and despite my best exegetical efforts to reconcile the

competing statutory provisions, I can reach no other conclusion than that  § 6-2-113, if

read literally and in its entirety, is internally and irreconcilably inconsistent; internal *pari*

*materia* is impossible.  Given that conclusion, a literal reading of the statute must give

way to a consideration of legislative purpose.  *See United States v. Campos-Serrano*,

404 U.S. 293, 298, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971) ("If an absolutely literal

9

reading of a statutory provision is irreconcilably at war with the clear congressional purpose, a less literal construction must be considered."); ***Bowland v. Industrial Claim Appeals Office of the State of Colorado***, 984 P.2d 660, 663 (Colo.App. 1998) ("[A] construction that produces absurd results must be avoided."), ***aff'd***, 993 P.2d 1152 (Colo. 2000).[4]

As noted, the express intent of § 6-2-113 is to prevent evasion of the purposes of the UPA. Defendant's interpretation of the statute permits sellers to evade the UPA's ultimate goal of promoting competition by prohibiting below cost and loss leader sales. The legislature could not have intended to create an exception that would swallow the rule in the manner defendant's preferred interpretation would permit. Therefore, I must conclude that the only rational interpretation must be one in which the cost of each item and the cost of the concomitant concession is considered separately to determine whether that individual price is below cost. This condition is made express in other states' variants of the UPA, ***see, e.g.***, ***Home Oil Co. V. Sam's East, Inc.***, 199 F.Supp.2d 1236, 1240-42 (M.D. Ala. 2002) (interpreting 1975 Ala. Code § 8-22-10), and including it as part of § 6-2-113 is the only rational way to reconcile the apparently conflicting language of the statute.

---

[4] Given the apparent ambiguity in the statute, it also would be appropriate to consider the legislative history of the UPA. ***See United States v. Oregon***, 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575 (1961); ***Edwards v. Valdez***, 789 F.2d 1477, 1481-82 (10th Cir. 1986). However, despite an exhaustive search on the part of Tenth Circuit Assistant Librarian, Dan Cordova, to whom the court owes a debt of gratitude for his extraordinarily capable research assistance, there is no record of any legislative session, debate, or discussion regarding the UPA itself, let alone § 6-2-113. The most I have been able to discern is that the UPA passed through the legislature quickly and with very little change from the form in which it was introduced, so much so, in fact, that the statute as enacted contained the same typographical error as found in the California statute on which it was modeled. ***See*** STATE LEGISLATION PROHIBITING SALES BELOW COST, 52 Harv. L. Rev. 1142, 1145 (1939) (noting that the legislative declaration section directed that the statute was to be interpreted "literally," rather than "liberally").

For these reasons, I conclude that § 6-2-113 does not bless the grocery discount program simply because the aggregate profits realized from the sale of groceries thereunder accounted for the aggregate cost of the discount.  Therefore, defendant's motion for summary judgment on that ground must be denied.

## B.  CAUSATION AND EXPERT WITNESS TESTIMONY

Defendant also seeks summary judgment on the ground that plaintiffs cannot prove that the grocery discount program caused their alleged damages without the expert testimony of Jeffrey Bernard, which testimony defendant contends should be excluded pursuant to the Federal Rules of Evidence.  This motion implicates Rule 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED.R.EVID. 702.  As interpreted by the Supreme Court, Rule 702 requires that an expert's testimony be both reliable, in that the witness is qualified to testify regarding the subject, and relevant, in that the testimony will assist the trier in determining a fact in issue.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-92, 113 S.Ct. 2786, 2795-96, 125 L.Ed.2d 469 (1993); *Truck Insurance Exchange v. MagneTek, Inc.,* 360 F.3d 1206, 1210 (10th Cir. 2004).   The Supreme Court has described the court's role in weighing expert opinions against these standards as that of

a "gatekeeper."  *See Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 147,

119 S.Ct. 1167, 1174, 142 L.Ed.2d 248 (1999).

Under *Daubert* and its progeny, an expert opinion is reliable if it is based on

scientific or other specialized knowledge.  "The adjective 'scientific' implies a grounding

in the methods and procedures of science.  Similarly, the word 'knowledge' connotes

more than subjective belief or unsupported speculation."  *Daubert*, 113 S.Ct. at 2795.

In short, the touchstone of reliability is "whether the reasoning or methodology

underlying the testimony is scientifically valid."  *Id*. at 2796; *see also Truck Insurance*

*Exchange*, 360 F.3d at 1210.  The party proffering the expert opinion must

demonstrate both that the expert has employed a method that is sound and that the

opinion is "based on facts which enable [the expert] to express a reasonably accurate

conclusion as opposed to conjecture or speculation."  *Goebel v. Denver and Rio*

*Grande Western Railroad Co.*, 346 F.3d 987, 991 (10th Cir. 2003) (quoting *Gomex v.*

*Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995)).  Where the expert is one

qualified by experience to opine on the matter at hand, he must "explain how that

experience leads to the conclusion reached, why that experience is a sufficient basis for

the opinion, and how that experience is reliably applied to the facts."  *United States v.*

*Fredette*, 315 F.3d 1235, 1240 (10th Cir. 2003) (internal quotation marks and citation

omitted).

Rule 702 demands also that the expert's opinion be relevant, that is, that the

testimony "fit" the facts of the case.  *Daubert*, 113 S.Ct. at 2796; *In re Breast Implant*

*Litigation*, 11 F.Supp.2d 1217, 1223 (D. Colo. 1998).  "'[T]he standard for fit is higher

than bare relevance.'" *In re Breast Implant Litigation*, 11 F.Supp.2d at 1223 (quoting *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 745 (3rd Cir. 1994), *cert. denied*, 115 S.Ct. 1253 (1995)).  The proffered evidence must speak clearly and directly to an issue in dispute in the case.  *Id.*

Guided by these principles, I have broad discretion in determining whether expert testimony is sufficiently reliable and relevant to be admissible.  *Truck Insurance Exchange*, 360 F.3d at 1210; *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1243 (10th Cir. 2000). The overarching purpose of the inquiry is "to make certain that the expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Goebel*, 346 F.3d at 992 (quoting *Kumho Tire Company*, 119 S.Ct. at 1176).

Defendant identifies four alleged weaknesses in Bernard's testimony.  None constitutes grounds for exclusion of his opinions under Rule 702.  For example, defendant faults Bernard for failing to account for other relevant factors that may have played a role in the Montrose market during the relevant time period.  However, the cases on which defendant relies largely involve instances in which the underlying methodology employed was fatally flawed.  In these cases, nothing more than the expert's mere *ipse dixit* supported the connection between the existing data and the expert's opinion.  *See General Electric v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997); *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 783 (10th Cir. 1999).  Assuming *arguendo* that Bernard's opinion fails to account for other factors that may have had an impact on conditions in the Montrose retail gasoline market, that

circumstance does not render his underlying methodology unsound.[5]  ***See Orth v. Emerson Electric Co., White-Rodgers Division***, 980 F.2d 632, 636-37 (10th Cir. 1992).  The alleged gaps are not so gaping as to make his testimony inadmissible. Rather, they merely go to the weight of those opinions.  Likewise, Bernard's purported failure to distinguish between lawful and unlawful conduct and his factual assumptions about the attractiveness of plaintiffs' retail outlets are matters affecting the weight, but not the admissibility, *vel non*, of his testimony.  Any weaknesses in this regard can be fully explored on cross-examination or through the introduction of competing evidence. Finally, defendant's argument that Bernard's attribution of plaintiffs' losses to defendant is unsubstantiated and "seems contrary to common sense" is nothing more than a disagreement with the expert's ultimate conclusion.  Such difference of opinion is clearly insufficient to warrant the exclusion of expert testimony.

Accordingly, the motion to exclude Bernard's testimony must be denied. Because the remainder of defendant's motion for summary judgment is predicated on the assumption that Bernard's testimony will be excluded, that portion of the summary judgment motion likewise must be denied.

## IV.  CONCLUSION

Defendant's motion for summary judgment should be denied.  Its motion to exclude Bernard's expert testimony likewise should be denied.

---

[5]  In particular, Bernard is a consultant in the petroleum marketing industry, not an economist or statistician.  The fact that he did not perform a regression analysis, therefore, is neither surprising nor fatal to his testimony.

14

**THEREFORE, IT IS ORDERED** as follows:

1.  That **Defendant's Motion for Summary Judgment** [#100], filed December 22, 2005, is **DENIED**; and

2.  That **Defendant's Motion to Preclude Jeffrey Bernard's Expert Reports and Testimony** [#102], filed December 22, 2005, is **DENIED**.

Dated September 13, 2006, at Denver, Colorado.

**BY THE COURT:**

s/ Robert E. Blackburn
**Robert E. Blackburn**
**United States District Judge**

15